The last case today, No. 241739 St. Dominic Academy v. A. Pender Makin et al., will Counselor for Appellants please come up and introduce yourself on the record to begin. May it please the Court, Adele Kime for Appellants, St. Dominic Academy and the Redonis family. This case is about whether St. Dominic may participate in Maine's tuition program on the same terms as Exeter and Dana Hall, two out-of-state prep schools that receive Maine funds and educate Maine students. The answer is yes, under the free exercise and free speech clauses. Before I get into my argument, Your Honors, may I please briefly outline three ways that our case is a little different from Crosspoint, which just went ahead. So first, our case does involve some additional plaintiffs, the Redonis family, who are here with us in court today. Second, we have some additional claims, for example, unconstitutional conditions, also Expressive Association. And third, in our case, the District Court correctly found that Maine's laws are not generally applicable because this same program admits both in-state and out-of-state schools. It requires all of the schools, whether in or out of the state, to, as a condition of receiving funds, to comply with Maine's curricular requirements. In the case of most of the out-of-state schools, that means NEASC accreditation. That's the same accreditation that St. Dominic has. However, it does not apply the Maine Human Rights Act or any similar non-discrimination requirement on schools that are situated outside of the state. It has never pursued its asserted interest in non-discrimination in the use of Maine funds with respect to out-of-state schools. The District Court found that that made this law not generally applicable. How do we, how do you propose we define, think about generally applicable? On the one hand, it could be, are you exercising your power to the utmost reach that you can possibly get everyone? Or another way of thinking about it is, to the extent you're not doing that, you're not doing that based on factors that have nothing to do with religion. So, here, geography defines the universe, and then everyone in that universe is treated the same. Okay, so, Your Honor, two responses to that. First, the Supreme Court has provided clear guidance in tandem. And in tandem, the Supreme Court said, comparability must be assessed with respect to the state's asserted interest. We know what the interests are in this case. Maine has said it, Respondent's Brief 39. It has an interest in preventing public funds from being used to fund discrimination. So, that's the touchstone under tandem. Well, you could say it has an interest in keeping Maine-based educational institutions from using Maine funds, but that there's a countervailing interest of not wanting to extend authority too much outside the state. Okay, so that's not the interest that Maine has asserted here, and they are bound by that interest. But, Your Honor, if we were to go down that road, I would just say that you're going to run into a roadblock, and that's tandem. In tandem, the Ninth Circuit said, we don't need to listen to Diocese of Brooklyn or Orthodox Union, these other cases that the Supreme Court has just decided about COVID closures, because those involved public-facing houses of worship compared with public-facing big box stores, et cetera. They decided that those were not comparable because what was at issue in tandem was private religious gatherings in-home. They were reversed on that basis, Your Honor. And Justice Gorsuch made it very clear that you must look at the state's asserted interest, not the reasons why people gather. So there are lots of reasons that you can distinguish in-state and out-of-state schools. There are lots of reasons you can distinguish post-secondary and secondary schools. But the touchstone is Maine's asserted interest. And this goes to the hypo that you posed earlier and that Justice Selya followed up on, right? Pre-K. The answer is, no, it's not generally applicable. If Maine has a pre-K through grade 12 funding program, and it applies curricular requirements across all of those years, but it says the pre-Ks don't have to comply with our non-discrimination requirements, and the interest is asserted in avoiding discrimination for public funds, then that makes it not generally applicable. Changing the universe, like the aperture, Your Honor asked that question about kind of, isn't it about the level of generality? That's exactly right. This is a major issue of litigation in Fulton and in Tandon. And in both Fulton and Tandon, the Supreme Court said very clearly, the state can't game the general applicability analysis by saying, we just want you to look at this one very small part of our law and not the whole way that the law functions in practice. So that path is just, there's just roadblocks. They're called Fulton and Tandon on that basis. The interest is the touchstone. Maine does resist this by saying, look, all out-of-state schools are exempt, religious or not, and all in-state schools are under this law, religious or not. And that is also roadblocked by Tandon, Your Honor. Tandon addressed this exact move. California tried to make a similar move. And it held that it is no answer that a state treats some comparable secular activities just as poorly or even less favorably than the religious activity in question. What matters is whether any comparable activity is treated better. Here, Dana Hall is treated better than St. Dominic. And that ends the analysis as far as general applicability. You can't treat Dana Hall and Bowdoin better than you're treating St. Dominic and Auburn. Now, because this law is not generally applicable, and I would just say, just backing up, there are a lot of claims in these cases, Your Honors. But truthfully, we believe the most straightforward way to decide this case is on general applicability. We think that's where the answers are clearest, and there's the fewest issues with limits. It's just not Maine tried to avoid Carson. They just didn't succeed. They used a law that wasn't generally applicable. And that's all you need to find. That's not sufficient for your needs, though. If we were to hold that solely because of general applicability or lack of thereof the case fails, then that would invite an amendment that would then apply to out-of-state schools and pre-K. Well, Your Honor, in that case, I would encourage this Court and the future federal courts to apply this kind of searching analysis that Lukumi requires. If they were to amend their law in response to a lack of general applicability here to continue the exclusionary practices that they were commanded to drop in Carson, I would say how much longer are the federal courts going to put up with this gamesmanship? Look, this is all fun and games for the State. They can play this forever. They have attorneys on the payroll. But I have clients whose daughter is going to graduate in two years. Now they have a son coming up behind. There's no chance of mootness in this case. But admission season is coming up. Every week during admission season last year, St. Dominic got calls from rural Maine families saying, Can I please use my benefits here? These are areas where there are no public schools. Many of these families have very limited means. We have parents who are working three jobs to send their kids to St. Dom's. And they are entitled to the State's benefit. And the State is just playing this game in court and playing things out. So I would just say, Your Honor, please do not allow them to continue. Please make it clear and find on these facts that Maine has simply not met its burden under general applicability. Now, of course, general applicability doesn't end the analysis. There is strict scrutiny, if I may turn to that. Some of the regulations or statutory provisions that you're challenging only apply if you accept student funding from the State. Some, at least one or two, seem to apply whether you accept funding or not that are being challenged. Could you parse out which is which? Because it was not clear from the briefs. So, Your Honor, it's not clear because Maine has been playing a lot of games with this. So Maine has said that this, the MHRA, this section, the educational non-discrimination section of the MHRA, 4602, only applies to private schools in Maine that are approved for tuition purposes. That means the minute we are approved, every decision we make on a daily basis about student speech, which clubs to allow, which clubs to discourage, which students we invite to pray three times a day over the loudspeaker, that's a practice that the school has, whether students have to go to mass or can opt out of going to mass. So you're saying the expression rules. The expression rules and the religious non-discrimination rules, the entire provisions, 4602, only applies to us if we receive Maine funds. I'm sorry not to answer it more directly. The hiring rules, the employment rules, Maine's new position, new argument of counsel in this case, is that the, our hiring rights are also conditioned on our participation or non-participation in this case. In Carson they said, remember, you can't, if you receive funds, you can't, you will lose your hiring rights. Now they've said, well. So 4572 is. Yes, Your Honor. Contingent on tuition. 4572, they are now saying is contingent on tuition. So in both of those cases they're saying it's contingent on tuition. So, you know, Supreme Court has said it's too late in the day to say that that makes a difference. You can't condition the loss of a, the condition the receipt of a benefit on the foregoing of a First Amendment right. So, and the rights that we're exerting here are not just, they're very core First Amendment rights. The Supreme Court and Hosanna table recognize that a religious school is the archetype of an expressive association. This is really core protected speech that they're asking us to forego, core protected activity that they're asking us to forego. Yes, Your Honor. I feel a question forming on your lips. I must be wrong. Anyway, talking about strict, did I answer your question? I think so. Okay. On strict scrutiny. So to prevail on strict. Let me sum up. I think you would say all the statutes here. Yeah. Are, fall under the, if you get tuition then. Yeah. Yes. At this time that is my position. Okay. And that's our understanding. So to prevail on strict scrutiny, Maine must assert a compelling interest, show that it's used the least restrictive means. It's failed to meet this burden. This is where the district court, we believe, just did not apply the correct analysis. Maine has asserted a broad interest in, quote, preventing public funds from being used to fund discrimination. This kind of broad nondiscrimination interest has come up at least five times at the Supreme Court. Dale, Hurley, Masterpiece, Fulton, 303 Creative. In every one of those cases, you had claimants who believed that sex should be reserved for marriage between one man and one woman. Commonplace belief, commonplace religious belief, belief that is sincerely held by Catholics in Maine. Each time the U.S. Supreme Court ruled that the claimant should win. 303 Creative put it this way. When a state public accommodations law and the Constitution collide, there can be no question which must prevail. This is why Bob Jones, which is still good law and still prevents race segregation and discrimination, does not control this case. All of the cases that I just mentioned, Hurley, Masterpiece, Fulton, 303 Creative, would have come out the other way if Bob Jones was the controlling analysis. It's not for the reasons that counsel Abley put it last time. It was a very specific, historically rooted interest that was being asserted in Bob Jones. And that is a far cry from the very general, and I would say even amorphous, interest that the state is asserting here. These are important values. They are important norms. They are weighty. They are recognized. But they are not the kind of focused, compelling interest that is sufficient to overcome strict scrutiny in a case like this. I would say, though, Your Honors, there is an even easier way to resolve the strict scrutiny question, and that's with least restrictive alternative. And you can see in cases like Hobby Lobby, just as Kennedy actually skips over, we don't need to decide whether the interests asserted here are compelling. We can say that there is a less restrictive alternative because the state in this case has already decided and has run its program for years in a manner that exempts out-of-state schools which receive Maine funds, educate Maine students. They are completely exempted from the nondiscrimination requirement, has not pursued these interests at all with respect to out-of-state schools. That shows that Maine does have a less restrictive alternative available. And that is exempting the handful of religious schools. I mean, we're talking about two in this courtroom. There can't be that many more that would want to participate in this program from the requirements of this newly amended MHRA. So that is the least restrictive alternative analysis, not generally applicable, and Maine has a less restrictive alternative, we believe is the most straightforward way to resolve this case. On the employment issue, as I understand it, we have both sides agreeing, largely with how the law applies, that it doesn't apply to your client's hiring. The prohibition. Yeah, so you're right, Your Honor. They admit that some First Amendment rights, they will recognize. For example, our ministerial exception rights. They say, notwithstanding the text of our laws, we will recognize your ministerial exception rights even if you participate in the program. But then they say, right at the back of their briefs, if you look at page 51, they say, but we might have to investigate you if you make a decision that's based on your religious beliefs about gender, marriage, or sexuality. Then we might have to investigate you under our employment laws. So they make that admission. So there's no, you know, SBA list is the controlling case here. 2014, it post-states White House. SBA list says you have to have an arguably constitutional interest. Of course, there's no dispute here. Our hiring rights are a fundamental constitutional interest to us, right, under Hosanna Tabor and Our Lady. It has to be arguably prescribed by the statute. Your Honor, if our interest in hiring according to our faith is not arguably prescribed by the statute, then Maine committed Rule 11 violations in the previous Carson appeal and before the Supreme Court when it asserted that religious schools who entered this program and accepted this money would lose their hiring rights. It is at least arguable, and Maine has argued at length and for years and before this Court that we lose, that under this statute, there's contrary language in the statute. There's two different provisions that conflict. They've argued that we lose our hiring rights. But those statements all predated Carson. They did, Your Honor, but Maine has never advanced a reasoned basis for its change in position in this case. So it is at least arguable, Your Honor, and Maine has argued strenuously and at length that we lose our religious hiring rights when we accept this money. So that is more than enough for standing, Your Honor. So it was error for the District Court to dismiss the hiring rights claims on standing. And then, of course, its likelihood of enforcement. And once again, I would say to you, the same state government that has been rattling the hiring rights saber at religious schools for years under Carson I and before the Supreme Court and on the steps of the Supreme Court following Carson, we are reasonably in fear that that same state government would resume its practice of seeking to deprive us of our hiring rights, particularly because the Commission is an independent authority from the AG that has independent enforcement and investigation powers and subpoena powers and has the independent right to investigate us without any complaint, without any third-party complaint. They admit in their briefs. The Commission may investigate us at any time. We've laid ourselves bare, Your Honor. They know all the policies. They know exactly where we conflict with their interpretation of the law. And they could investigate us at any time. We live under the threat of that the minute we seek approval. Thank you, Your Honor. Thank you, Counsel. Will the Attorney for Appalachia please come up and introduce yourself on the record to begin? Good morning again, Your Honor. May it please the Court. My name is Christopher Taub. I'm the Chief Deputy for the Maine Attorney General's Office. And with me at counsel table and on briefs is Assistant Attorney General Sarah Forster. I'd like to start by addressing the employment provisions. To be absolutely clear, the State of Maine has never played games, and we've been entirely consistent throughout this litigation and the Carson litigation with respect to our position about employment vis-à-vis taking public funds. And I think it's important just to recognize that there are different provisions that are at play here. There's one provision in the Maine Human Rights Act that exempts religious organizations that do not take public funds from the anti-discrimination provisions with respect to gender identity and sexual orientation. Then there's another provision in the Maine Human Rights Act that says that a religious organization, regardless of whether it accepts public funds or not, a religious organization may require that all applicants and employees conform to the religious tenets of this organization. What we have said before, Your Honor, is that if a religious organization took public funds, it would no longer be able to refuse to hire a person simply based on that person's status as under sexual orientation or gender identity. But if, in fact, it turns out that that person is unable to conform to the religious tenets of the organization, then the organization would be allowed to refuse to hire that person. So, for example, it is likely that a person engaged who is actually in a same-sex marriage might not be able to conform to the religious tenets of a particular organization, and so under the Maine Human Rights Act, a decision not to hire that person would likely be protected. On the other hand, it may not be that simply because a person is gay, that may not necessarily mean that that person is incapable of conforming to the religious tenets of the organization. And so that's the distinction that we're making. And so the difference is that if an organization takes public funds, it is no longer going to be allowed to just flatly discriminate against a person purely based on their status. And I see maybe a puzzled look, and let me just pause there and see if there's a question about that. Well, you used the word likely twice. What I'm hearing of the concern from the other side is that as long as it's arguable, then they've got the sort of Damocles hanging over them. So I guess I would ask you, do you think the test is arguability? In other words, as long as it's arguable that they could be fined, then the issue is presented for review. And secondly, if not, do you really mean just likely when you're talking about the probability that they'd be successful? Just to clarify, when you say the test, are you talking about the test for rightness, abstention, or something else? So for rightness, this relates back to the point that whether or not some particular practice would likely or not likely or hypothetically violate the Human Rights Act, there still has to be some showing that that situation is going to present itself. So in this situation, we don't have anything to suggest that there is going to be a person who is going to apply to St. Dominic who is gay, and St. Dominic refuses to hire the person simply because of their status. We don't know whether that's ever going to happen. And so what we would say is that in the absence of some showing that there's this imminent risk that that situation is going to happen, and because we have third parties involved and we don't know what third parties will do, that's why we're arguing that the case is not right. And we're also arguing in the St. Dominic case in particular, and the reason that we're only arguing abstention in the St. Dominic case is because it's very unclear whether anything that St. Dominic currently does would violate the main Human Rights Act. They will admit students regardless of sexual orientation or gender or religion. And so it's not clear to us whether one single thing would have to change. And so that's why we think it would be inappropriate for the court to decide the case until these issues have been clarified by a state court. So I think these sort of go both to ripeness and abstention. This case is premature, and we just don't know how a state court might interpret these provisions. When you say not clear, are you saying that the reach of the statute and the meaning of the statute is not clear, or are you saying the facts that would present in a particular case lack of clarity, and the resolution of that clarity could be dispositive either way? I think we might be saying both, but I think I was mostly suggesting that the law itself is not clear, and I can give you a specific example. St. Dominic says that it does not discriminate based on religion, but it will give preference in admissions to Catholics, and it will give preference to Catholics in financial aid. What we don't know is whether a state court would hold that that is discrimination for purposes of the main Human Rights Act. A court might say that if you have fewer seats than are available, you can prioritize persons based on their religion. So that's just one example. The other thing we don't know, because this case is coming up on a preliminary injunction where there really hasn't been any discovery below, is we really don't have a good sense of what St. Dominic's practices are, and so we don't really understand, for example, are there students at St. Dominic who hold a contrary view about reproductive rights than the Catholic churches, but they're still allowed to remain there. So we don't know that. As we were talking about before, we really don't know what the religious expression provision is getting at, and I did just want to point out, and this is something we argued in the brief, and we're not suggesting that this provision is unlawful, but to the extent that the court is concerned about the religious expression provision, that could easily be severed from the statute. But we don't think that the anti-discrimination provisions should fall simply because the court has some concerns about this religious expression provision. I also wanted to address the issue of general applicability, and I think what's important to understand, and I'm referring to cases like Tandon, the Roman Catholic Diocese versus Cuomo, the Leukemia case. What the court is looking at there is the state drawing lines based on religion. So, for example, in Leukemia, you could basically kill animals for any reason whatsoever as long as you were doing it as part of a religious rite. And in the Roman Catholic case and the Tandon case, you could gather an unlimited number of people for the purposes of shopping, but you couldn't gather for the purposes of worship. So these are cases where the state was distinguishing based on a religious element, and that's not what's going on in this case. Here, we're not drawing lines based on religious character. We're drawing lines, in one case, based on geography. And, again, we're not really drawing a line. That's just sort of the natural result of the fact the state doesn't have jurisdiction beyond its borders. And we're drawing a line on K through 12 versus post-secondary. The jurisdiction point is a bit of a red herring, isn't it, because you could easily condition the payment to the school on their compliance with the act. I think that's conceivable, that we could do that. I will say, and, you know, there's something of sort of the tail wagging the dog here. Out of about 4,500 kids who are receiving tuition payments either to go to a school that's under contract or to go to a school that the parents choose, I believe two of them are going to out-of-state schools. So we're talking about a very, very de minimis result here. And leaving aside all the other arguments that we're making about how we're not drawing lines based on religion, religious schools fall on both sides of the line, we don't think that this very de minimis result should mean that our statute is not generally applicable. Another point is that what the Supreme Court has said about sort of general applicability is that you have to show that the conduct that's been exempted implicates the state's interests in the same way. Not just does it implicate the interest at all, but does it implicate it in the same way. And so we would argue that Maine has a much more attenuated interest in stopping discrimination that's occurring outside of its borders than it does within its borders. And so I think if you asked an average Mainer how do you feel about in-state schools discriminating versus how do you feel about a school in Worcester, Massachusetts discriminating, I think you would get a different answer. Because really what the state's biggest interest is is dealing with conduct within its borders. That's what states traditionally do. And so I think the fact that a couple students are going to out-of-state schools simply doesn't implicate the state's interest in the same way. And how about post-secondary schools? Post-secondary schools I think is even farther afield because this is a completely different category of schools. The Maine Human Rights Act is dealing with compulsory education. So these are kids who are in a school because the law compels them to be there. It's kids that are going to a school where the public is paying for the entire cost of that attendance in most cases. It's schooling that's being provided pursuant to the constitutional obligation of the state. It's not a situation where students who are often adults in the post-secondary area are making their own decisions about where to attend. And the state at most, you know, I think that these grants are around $2,500 based on financial need. So at most for some of these students, you know, the state is subsidizing a portion of the cost. So that is much different than the K-12 world where the state is entirely paying for it. Well, not the state, but the municipalities and the public are paying for it in order to comply with their constitutional obligations. Could you give your view as to which of the regulations that we're talking about in the statute are dependent on acceptance of funding and which are not? So the educational provisions are contingent on, with respect to a private school, it's contingent on the private school accepting tuition payments. With respect to the employment provisions, this sort of gets into the nuance that I was discussing before, which is the exemption for allowing to make employment decisions because an employee or a prospective employee can't comply with the religious tenets, that applies regardless of whether you take public funds or not. In the employment context, the provision that is hinged on accepting public funds is the one that talks about discriminating against a person based on sexual orientation or gender identity. Does that answer your question, Your Honor? I don't know if I fully answered it. Yes, both answers have been as clear as the breeze on that. I mean, Your Honor, to the extent you're expressing some irony or sarcasm, we have not tried to play games in this case. We have tried to be as clear as we can. We have tried to be as clear as we can with respect to the employment issue. If, you know, again, regardless of, and also I should say that there's the ministerial exception, so to the extent that St. Dominic's has employees, and I assume a lot of their employees are going to fall within the ministerial exception, those employees are going to be entirely exempt from the Main Human Rights Act. But with respect to state law, just to say it again, St. Dominic's, regardless of whether it takes public funds, can require all of its employees to comply with its religious tenets. And it can require them to be members of the same religion. If it takes public funds, the difference is going to be that it can no longer discriminate simply because of a person's status. So it can't refuse to hire a person simply because the person is gay. But if that means that the person can't comply with their religious tenets, then that would not be subject to the Main Human Rights Act. Just a couple points on the neutrality issue. I think that the chronology is important to keep in mind. So when the amendment to the Main Human Rights Act that's at issue here was proposed to the legislature and was enacted, that was before the U.S. Supreme Court had granted cert in the Carson case. And it was after the state had successfully defended the statute in the main law court, in the main district court, in this court, and the Supreme Court had three times denied cert. So it was far from clear what eventually would happen with the Carson case. That said, I think it is a reasonable inference that the legislature was aware of the Carson case and maybe was anticipating that depending on how the Carson case got decided, that the state might have to allow religious schools to participate in the tuition program. And so if that was the thinking, it made complete sense at that point to now draw the exact same line that it was drawing in the context of employment and housing, which is to draw a line based on whether you accept public funds or not. And so until then, they didn't have to draw the line for schools because religious schools weren't eligible to participate. So again, to the extent that the Carson litigation somehow motivated the legislature, it was likely just to make them realize that they had to bring the educational provisions in compliance and match up with the employment and the housing provisions. The counter-argument presented to that, and I touched on this before when you were up in the last case, as I understand it, is that particularly the expressionism, the expression provisions, are effectively a proxy for being a religious school as a practical matter. And so that view, as I understand it, and I'm interested in your thoughts on it, is that we have a law that prohibits funding going to religious schools. Oops, we can't do that. So we'll have a law that penalizes religious schools if they act like religious schools. That's the argument. What do you say to that? First of all, we have a religious school that's in its third year of participation. But that aside, our law does not prohibit schools from acting like religious schools. They can still teach from the Bible. They can teach religious beliefs. They can teach that their religion is the only one religion. They can teach all the values and doctrines. So for example, they're free to teach that God created only two genders and that a marriage is only a marriage between a man and a woman. They're still free to teach that. What the Maine Human Rights Act says is if there's a gay student, for example, who wants to receive that teaching, you can't preclude them simply because they're gay. And I don't think that that interferes with the religious mission of these schools. I see my time is up unless there are further questions. Thank you very much. Thank you, counsel. That concludes arguments in this case.